People of the State of Illinois, Mr. Markell Brown, for the appellant, Mr. St. Germain, and for the athlete, Mr. McNeil, you may proceed. Good morning, Your Honor, and may it please the Court, Counsel, my name is Santo St. Germain. May I proceed? Once again, good morning, Your Honors, my name is Santo St. Germain, and I am here on behalf of Mr. Markell Brown. The Illinois Supreme Court has held that the key issue in admitting video recordings is determining the accuracy and reliability of the process of production. Despite this constant reminder, the Court has recognized six factors in making this determination. The State evidence here runs counter to three of those factors, but more importantly, the State provided no evidence relating to the actual process of production. The State relies entirely on disconnected evidence and argues that the video alone is evidence of its own reliability. Such a rule in light of the advance of video editing is indefensible, Your Honors. To be clear, the video recording in this case was contained on a smartphone, which was alleged to belong to one Joseph Cotton. Mr. Cotton showed the video recording to police officers. He provided them access to his phone and access to the video recording. However, at some point during the investigation, Mr. Cotton became uncooperative and refused to provide further assistance to law enforcement. The State elected from then on not to put Mr. Cotton on the stand. Did Cotton ever tell the officers that he was the one who took the video with the phone? No, Your Honor. There's no testimony to that point. And the clear reason is because Mr. Cotton was not called, any testimony relating to what he would have said would have been hearsay. Nonetheless, the recording was on his phone. And the key issue here is the provenance of that recording and whether Mr. Cotton was in fact the person who recorded the videos or the incident that was shown on the videos. Without his testimony, we don't know anything as to the process of production. Even if the State could establish some of the six factors, it can't establish the key issue, the reliability and the accuracy of the recording process. So, the State relies entirely on disconnected testimony from police officers. The testimony established that the officers were first, as I stated, first shown the video by Mr. Cotton. From there on, the officers, only what they testified to is to the scene and the objects shown on the video. What they were able to testify is that when they went to the location of the alleged crime, they were able to match certain objects shown on the video with objects that they saw at the scene. What they did not testify to is whether the, again, whether the video recording was in fact made on the phone or whether it was received by Mr. Cotton from a third party that is yet to be unknown. More importantly also, the video, the second video at issue has a time skip in it where the scene went from one scene to a completely different scene. And there's no explanation as to that. Even the retrieval officer, Officer Tim McNard, who retrieved the video from the phone is unable to explain why there's this skip in the scene that is being depicted on the second video. So, does the Court have any questions as to this point? I have a question. Yes, Your Honor. So, again, we're keying in on accuracy and reliability. We had the officers testify, multiple officers testify that in the video is the scene that they observed and objects within that scene. And there's testimony of the alleged incident. That doesn't come to the level of authenticating the video? No, Your Honor. Because if we, one, the matching of the bedroom shown in the video with the bedroom at Mr. Cotton's house, that's one of six factors. Right. And what we have, we will always have that. There will always be a matching of objects, places, and even of persons. So, beyond that point, we don't know the context of what is being depicted. And that is where the accuracy is the key question. Now, the reliability may go as to object. We could be reliable that the video is showing one specific place. But it doesn't tell us how the incident that came about occurred. More importantly here is that the alleged victim was only able to identify herself from still images. When she was shown images of clothing worn by the two other persons shown in the video, she said she couldn't remember if anyone that night was wearing these articles of clothing. Which is also the same factor as to identifying objects. She could only identify herself. Let me ask you this. If not for the alleged offense being depicted, would this video be admissible to set the scene, to show the jurors the area where the alleged offense occurred? Is the fact that the ultimate alleged offense is depicted, which would make it inadmissible? I.e., otherwise it's reliably relevant as to the scene where this allegedly occurred. If I understand what you're saying, but for the scene, but for the actual alleged act, can the video be enough to show the bedroom itself? I don't think so, Your Honor. Because the bedroom, there's enough testimony to establish the scene of where this crime occurred. The young lady in question testified that she was at that house, that she was in this bedroom. There are pictures taken by police officers showing the bedroom, showing the stains on the bedroom. All of this could be established beyond the video. But also, Your Honor, I don't think there is any way to separate the events depicted from the scene itself. Because the event occurred in the scene, and the critical issue is the event. And we want to be accurate, and we want to know that these events were reliable. Without Mr. Carton, we don't know anything. We don't know if the video recording was made on the cell phone. We don't know if he took it from a third party. We don't even know if this was actually staged, because the alleged victim doesn't remember anything. If the court don't have any more questions. Well, if it was staged, and the victim was unconscious, isn't staging it indicating that it occurred? Maybe that was a poor choice of words on your part, or maybe I'm misunderstanding what you're saying. What I was trying to say, Your Honor, and yes, that may have been a poor choice of words on my part, is the problem is that we've reached to a point in technology where video editing has gone beyond our own level of understanding. My question is though, and this relates to maybe the testimony of the one officer, or maybe the things outside the record, but does a video on a smart phone have a timestamp? There was a timestamp as to the file, the recorded file. The file. Yes. That timestamp is not on the video itself. If you look at the video, there's no timestamp. Those timestamps that show on the file are consistent with the time frame within which this incident appeared to have, or is alleged to have occurred. There's no, I don't believe so, Your Honor. There's no actual testimony connecting these two points. The metadata, one of them is at 1.39 and one of them is at 1.44, and that, maybe I'm misunderstanding the time frame of that day, but that's about the time that this stuff occurred, isn't it? Well, she is. Or which we think they, or alleged to have occurred. Yes. We know that it occurred in the post-noon hours of that day. But that timestamp only relates as to when that file was either created or received by the smart phone. And then the question is, can you tell whether that is a received video based on the metadata from the phone, or can you only, you can't tell if it was received or recorded? I'm going to go on and land as to my own understanding of smart phone. You can determine that, but there is no testimony as to either whether it was recorded or received. That's the key issue here, is that we don't know enough about this video and where it comes from to make a determination as to whether it's reliable and accurate. So Counsel, if I understand your position, you're saying State had to have Cotton testify as a witness in order to get the video before the jury, and yet Cotton refuses to cooperate. Therefore, the State is just in a situation where they can never present the video to the jury. No, the State has alternative means by which to get Cotton to create foundation. What happened in this case, Your Honor, this is not a situation where Cotton actually refused. The State just simply chose not to bring him on. What the State said is, he's not reliable, and he's not reliable, quote-unquote, because he has pending charges. What the State never said is, he's beyond our reach, we cannot subpoena him, we cannot fine him. In fact, the fact that he had pending charges in Champaign County means that he was within the reach of the State. The State could have called him, put him on the stand, make an offering of proof, see what he's going to do. He could have been advised that he's placing himself in jeopardy of contempt of court. And if he does testify, or if he refused to testify, they could impeach him with statements that he actually did make to police officers. The only reason we don't know the substance of these statements is because without him, these statements are hearsay. But if he was on the stand, and he's being impeached by the State... He couldn't take the fifth? He could take the fifth, but then he would be held in contempt. No, Your Honor, I actually, I don't think he could take the fifth. For him to take the fifth, he has to be at risk of further prosecution. There is nothing from these videos that shows that he is at risk of further prosecution. The fifth only applies if you, to assert the fifth, you have to be successfully able to do so. To do so, you have to demonstrate that any answer you would give puts you at risk of further prosecution. I don't take Mr. Cotton being called and saying, is this your phone? Yes. Did you record an incident on the day of? Yes. Does the video show exactly that incident? Yes. That answer... Is it possible that the State could have charged him on accountability? Given that he's in the room, and he doesn't have maybe a legal obligation to stop what's going on, but isn't he participating in the activity by filming it and having the alleged perpetrator turn and smile at him while he's taking the video at a time that the individual smiling is assaulting or preparing to assault an unconscious victim? Your Honor... I think I could make an argument as a prosecutor that he's promoting the offense by filming it and egging the guy on. There's no evidence on the video that he's actually egging the guy. You don't hear Mr. Cotton. You don't hear his voice. You don't hear anything. As to the charges in this case, it's fundling, it's sex assault. You have to show two things for accountability. One is that he's actually aiding or abetting recording in itself. First of all, you have to show what was his intent for the recording. Maybe his intent was in fact to submit it to police officers. Again... Which he did. Which he did. Again, without Mr. Cotton. The entire reason we're talking about this and we're speculating as to what could have happened and could not have happened is because the state elected not to put on Mr. Cotton. And because he was the first person who produced this video, the point of origin of the video and therefore the reliability and accuracy of what's being depicted depended on his testimony. And without it, we don't know much about what's going on here. If there's no further question, I would ask that the court reverse and remand for the trial. Thank you. May it please the court. Counsel. I guess we're concentrating on argument one here. I cited this court's opinion in LS and the first district's opinion in CQ in my brief, but also Taylor itself lent support to this being a sufficient adequate foundation for admitting these videos. Taylor itself states the fact that the tape exists at all is evidence that the tape recorder was functional and that the operator knew how to operate it. That knocks out the first three of the Taylor factors right there. More importantly, the most similar case to this would be DQ, the first district case. There, a person receives a video message on his phone of a mother striking her child, doesn't know who it's from, then testifies at trial that the same video he received on his phone  The appellate court held that that was sufficient to demonstrate the authenticity of the recording. The main similarity between this case and DQ is the fact that the filmer did not testify at either one. In fact, they didn't even know who the person who filmed was in DQ. The point being, the video was clearly operational at the time and was able to record sufficiently clearly so that the individuals in the video were identifiable as were their actions. Our Supreme Court has found, that's referring to Taylor, that such evidence is sufficient to adequately demonstrate that the camera was able to record and was generally operating properly. There's nothing in this case that indicates there was some faulty thing in Cotton's smartphone that somehow inserted the defendant into a sexual abuse video. I mean, that would be ludicrous and this is nothing but pure speculation. As this court stated in LS, which Justice Connick concurred with, the mere possibility of tampering, unsupported by any evidence of tampering, does not render a video inadmissible. In other words, we can speculate all we want. As counsel stated, apparently video editing goes beyond our level of understanding, then I guess we can never have any reliable video evidence ever again. That would be an absurd result. And clearly here, there's nothing to indicate that this video was tampered with or even how. I thought this dicta in LS was instructive. Respondent presented no evidence of tampering, nor did she even posit how or why anyone would have employed Hollywood-style video manipulation skills and advanced computer hacking to create and stream a fictitious webcast. There it was a webcast. Also in that case, there was of course no testimony by who actually filmed the video that went out over the webcast. So LS and DQ establish a point, as does Taylor itself, that the person that recorded the video doesn't necessarily have to testify to establish an adequate foundation under the silent witness theory. This case is a perfect example. All the testimony, all the circumstantial evidence points to this recording, these two recordings being exactly what they purport to be. Cotton shows his phone to an officer on the afternoon of February 3, 2016. Shows his phone to multiple officers. Those officers state that this bedroom is in the exact same condition as it was that day, as in the video. Ms. Flowers testifies that yes, she went over to Cotton's house on that afternoon, drank enough to pass out, and was indeed wearing the same clothes, which included a distinctive pair of shoes she borrowed from a friend, as well as a distinctive pair of pants. That's what she was wearing that day. Also, the defendant was present at the apartment before she did pass out. Counsel, I found it odd that no one ever identifies the defendant on the video. Why wasn't she shown the video and asked whether this is the defendant, instead of just showing a picture of the defendant, and saying the person in the courtroom is the person depicted on the photo? The state was being especially conscious here. Under the silent witness theory, the video speaks for itself. In other words, there can be no improper narration of the video by anybody who doesn't personally observe the events. So the jury alone, then, is left to look at the picture and compare that to the person depicted in the video and make the decision whether that is the same person, that being the perpetrator. The jury alone also had another great benefit. They observed the defendant throughout the whole proceeding, sitting at counsel's table. Right. So... And there's nothing... It just seems odd to me. I can't remember having seen a case develop like this. It's not that... There's no problem with it. I didn't see much case law in either brief regarding this particular issue, and I noticed the defense counsel didn't argue it. Well, I stated in my brief that the video does speak for itself. Okay. Dwayne Sykes was a few years back. I didn't cite the case, but I lost that case because somebody improperly narrated a video that they didn't have personal knowledge of. So you're saying the state conscientiously decided not to ask her, is that the person in the video, is that the defendant? I would think so. Because you thought that would be problematic. Well, yes, and if you look at their pleadings beforehand in the motion in Lemonnet, they're well aware that under the silent witness theory, the video speaks for itself. That's why defendant dwells in many of his arguments on the fact that the defendant was never positively identified by the video. That is because I'm sure the state was under the impression that that would have been improper. The person in the black hoodie looks identical to the defendant. The jury saw the video. The jury saw the defendant. They made the world's most obvious reasonable inference that the person in the video was defendant, and that was, of course, sufficient to prove him guilty beyond a reasonable doubt. But as for the admissibility of the video, again, this is an abuse of discretion standard. All six tailored factors lend support to the state's position that this was an adequate foundation for admitting this video. I would like to point out one thing in counsel's reply brief. On page 2, he states that the state offers no arguments regarding the relevance of Cotton's competency in recording the video. On page 10 and 11 of my, and therefore I have somehow forfeited, presumably under Supreme Court Rule 341, pages 10 and 11 of my brief, I go into the fact that Taylor states the fact that the tape exists at all is evidence that the tape recorder was functional and that the operator knew how to operate it. In other words, the competency of the recorder, the competency of Cotton, is established by the fact that the video exists at all. And I start that paragraph by saying, as for the device's capability and operation of the device by the operator. So I would refute that there's no argument by the state on this factor. And also, after discussion with my director and other attorneys in my office, this seems to be an increasing point in briefs by OSAD that somehow, because the state frames an argument differently, that it's somehow forfeited. And I would state that just because OSAD does not agree with how we put an argument down or how we respond, or they would have responded differently, clearly does not mean that that issue is forfeited. If the court has any questions on any of the other issues, the Rule 431B admonishments, the due diligence of the DNA evidence. I have a question in response to opposing counsel's comments. And that is, in your view, counsel, why not call Cotton? Well, I think Justice Kinnick nailed it. I'm sure he wised up after initially showing the police. I mean, this was in the moments directly after the assault or directly after Flowers was in the hospital. He showed two police officers, I think, to the video. And then they took his phone after that. Presumably after that, he probably thinks, hey, I can probably be charged as an accomplice in this. I'd expect to see something in the record with regard to that. There's plenty of issues taken up in the minute. Well, they state only that he was no longer cooperative. And that would be my... What did he do with her when he carried her out of the... He took her to another apartment complex. But she said she didn't wake up until she was in the hospital. Okay. There are no more questions, I think, before... Bob? Yes, sir. As to Justice Turner's question, if they could have taken a still from the video and show it to the defendant and say, can she identify herself, I don't see why they couldn't have done that for... They took a still from the video, they showed it to the victim, and she identified herself. If they could have done that, why didn't they take a still of my... You know, have her compare it and determine whether that was him. They didn't do that. What they did, they took a mug shot from after he was arrested. Actually, we don't know what point that mug shot was created, and asked her if that's him, and then she identified herself. Counsel, I kind of tend to agree with you, but as Mr. McNeil said, the jury had the opportunity to view the video and your client and matched it up. And apparently, there's no case law that says that the state had to do anything more than allow the jury to see... Sure. ...what was presented to them. Sure, the jury is allowed to make factual matching and inference to observe the defendant in the courtroom and observe him against any evidence that is properly admitted into evidence, and that is the issue here. The evidence was not properly admitted because we don't know anything about the accuracy and reliability. Now, I did refer, I did address my colleague, my opposing counsel's cases cited in his brief, in my reply brief. But I would like to just stress these cases again. In Taylor, the court did say, yes, the existence of the video suggests that the video was properly... that the recording device was properly operated. But in Taylor, we had a specific and idiosyncratic recording device. It was a motion-captured monitoring device. And that language in Taylor, as opposing counsel stated, is dicta, but that language was specific to a fact that was brought out in litigation. And that fact was there was a time skip that the parties were arguing about. And the officers were able to explain that time skip by explaining how the motion-captured device actually worked. So the fact that you actually, in Taylor, had a recording suggested that the motion-captured capturing device was actually capturing motion as it was supposed to do. Here, we have an operator operating recording device. The operator never testified as to how he was recording that device. In Deque, there was a wealth of corroboration. The minor testified as to the event that occurred. The father of the minor testified that he received the video from the mother of the respondent. And furthermore, the respondent even suggested that she knew who the person was who recorded it. The respondent said, and I quote, that video was produced by someone I believe was a friend. So in some way, she identifies someone she believes created the video. Finally, in LS, in LS, the video was, there was no video introduced in LS. What was introduced in LS was 12 stale images from a webcam. And they had a police officer testify that he actually viewed the webcam when it was live. And that the stale images depicted exactly what he saw in the live feed. So there was no need for an actual operator because there was an, as Justice Stagnant stated, there was an actual eyewitness in the police officer viewing the video live from the webcam. The, my opposing counsel suggests that the rule I'm asking is too broad that no video could ever be admitted. But what opposing counsel is asking is that if a video exists, it is self-authenticating and no foundation is necessary. What is necessary and what Taylor has held and what this court has reaffirmed is that the reliability and the accuracy of the images and the event depicted must be established through foundation. Without Cotton, who is the point of origin in this case, we don't know what's, we don't know anything about the reliability and accuracy of this video. I would ask this court to reverse and review. Can I ask one follow-up question? Yes. Okay, this is the, silent witness theory is an exception where testimony is not needed regarding the accuracy of the depiction. So the trial judge heard in Lemonet the information that came from Cotton basically as to how, not about the property, but as to how that information, the video, came to the police. Is it appropriate, and this is more of an evidentiary inquiry, but is it appropriate for the court to consider that information as to how the video came to be in possession of law enforcement as part of the accuracy of the process that produced the video? That's a long question. No, no. I mean, it could be considered a factor. If I could, I see that my time is done, but if I could just answer your question. If you take one step back, first of all, these six factors in Taylor are not exhaustive, so we don't know. There may be multiple factors that should be considered. Yes, how the video came about to police officers could be one of these relevant factors, but that doesn't go to the process of production. It only goes to the retrieval, and there was enough testimony here about the retrieval. What we don't have is the production process, and that is the reliability, because the entire thing is we need to know that this video is accurate and reliable, and we only know that from the production process. Without testimony from the production process, without Mr. Cotton, we have absolutely nothing. Thank you, Your Honor. Thank you. Thank you. We'll take the matter under due process to launch.